ROBERTO GALLARDO CHAVEZ
Reg. No. 05752-030
FEDERAL CORRECTIONAL INSTITUION
P.O. BOX 9
MENDOTA, CA. 93640



IN THE UNITED STATES-DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

ROBERTO GALLARDO CHAVEZ, ]

    Petitioner, ]

                          ]    Case No. 4:99-CR-00065

Vs. ]

                          ]

UNITED STATES OF AMERICA, ]

    Respondent. ]

## AMENDED MOTION FOR REDUCTION OF SENTENCE (COMPASSIONATE RELEASE) PURSUANT TO 18 U.S.C. 3582(C)(1)(A) UNDER THE EXTRAORDINARY DANGEROUS NATURE OF THE COVID-19 OUTBREAK AMONG FEDERAL PRISON POPULATION

TO: The United States District Attorney For The Southern District of Iowa.

**PLEASE TAKE NOTICE** that on December 13, 2019, Roberto Gallardo Chavez, ("Chavez"), acting Pro se, moved this Honorable Court for an order reducing his sentence pursuant to 18 U.S.C § 3582(c)(1)(A)(i) (Compassionate Release.).

1

Now, respectfully presents his desire to amend his pending Compassionate Release petition Under the Extraordinary and Dangerous Nature of the COVID-19 Outbreak Among Federal Prison Population.

Mr. Chavez invoked the intervention of this Honorable Court and presents that even after U.S. District Attorney's Memorandum granting Wardens to release inmates under certain criteria, Warden at FCI, Mendota refuses to release a sufficient if not minimum number of inmates under Compassionate Release or House Confinement even after the crisis and health catastrophe developed at many of the U.S. Federal Prisons which jeopardizes Mr. Chavez's life and wellbeing being that he is a prisoner at Federal Correctional Institution (FCI, Mendota).

The present petition is founded based upon Mr. Chavez's medical condition being; Battling with Prostate Cancer since 2009, Hypertension, diabetes, and shortness of breath, PTSD, Anxiety **(See Ex. A)** and the imminent exposure to contracting Covid-19 at FCI, Mendota, and the Extraordinary Nature of the COVID-19 Outbreak Among Federal Prison Population underlining that on this 08/04/2020 - The BOP has **128,542** federal inmates in BOP-managed institutions and **13,663** in community-based facilities. The BOP staff complement is approximately **36,000**. There are **2,017 federal inmates** and **542 BOP staff** who have confirmed positive test results for COVID-19 nationwide. Currently, **8,663** inmates and **720** staff have recovered. There have been **108** federal inmate deaths and **1** BOP staff member death attributed to COVID-19 disease. Of the inmate deaths, **4** occurred while on home confinement.

The number of federal inmates affected by the virus is not accurately exposed to the public, being that only at FCI, Lompoc, the number represents 960-inmates infected, also at FMC, Carswell, the number represents 516-inmates infected with the virus. This are only two of the many federal prisons that are being affected with this catastrophic matter.

The Federal Bureau of Prisons ("BOP")(FCI, Mendota) is mismanaging one of the worst public health catastrophes related to COVID-19 anywhere in the country— and at the epicenter of the outbreak are California Federal Prisons where more than half of incarcerated inmates have tested positive for COVID.

2

Warden at FCI, Mendota has demonstrated that he will not take the measures necessary to prevent the coronavirus from converting more prison sentences into death sentences without court intervention. Public health experts have been clear—to prevent the disease from spreading and reduce the burden on prison medical resources. Warden has failed to conduct testing in time for isolation to be effective, provide adequate personal protective equipment ("PPE"), properly treat and monitor those who are sick, and most importantly, reduce the prison population to allow for adequate social distancing and sufficient access to medical care.

## I. INTRODUCTION

The First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 ("FSA"), enacted several legislative and correctional reforms "to promote the rehabilitation of prisoners and unwind decades of mass incarceration." United States v. Rodriguez, -- F. Supp. 3d –, No. 17-CR-00021-WHO-1, 2019 WL 6311388, at *5 (N.D. Cal. Nov. 25, 2019) (citing Cong. Research Serv., R45558, The First Step Act of 2018: An Overview 1 (2019)). One such provision lowered the mandatory minimum sentences for drug offenders who were convicted under 21 U.S.C. § 841(b)(1)(A) and had certain prior qualifying convictions.

Chavez went to trial on all four drug trafficking counts in October 1999. The jury trial found Chavez guilty on all four (4) counts.

In January 2000, court at sentencing applied a level 38 drug quantity to Chavez, with a four (4) level enhancement as a leader of a criminal activity, and an additional two level enhancement for obstruction of justice, (for taking the stand and testifying in his behalf of his innocence). Which give Chavez a Total Level by the Sentencing Court of 44 with a Criminal History Category "0" (Zero)~ Chavez had no criminal history.

Whereupon the court sentenced Chavez with a Life Sentence on Count "No. 1, with another' Life Sentence on Count No. 2, also Life Sentences on Counts No. 3 and 4. With all Life Sentences to run concurrently and term of Five Years of Supervised Release on each count to run concurrently with one another.

3

Chavez submitted a request for compassionate release to the warden of the Federal Correctional Institution in Mendota, California ("FCI Mendota") on August 19, 2019. Chavez's request to the warden states that Chavez's "request is based upon several factors: (1) exemplary conduct while in custody, (2) extensive programming that includes his GED and more than 2000 hours of programing obtained while in custody **(Ex. B.)**, (3) age, and (4) deteriorating medical condition." Chavez's request to the warden specifically indicates that Chavez suffers from medical conditions including prostate cancer, and hypertension. The warden denied Chavez's request on September 28, 2019. **(See Ex. C.)**

### II. Change In Law, Mr. Chavez's Health, and The Outbreak COVID-19 Pandemic Present Extraordinary and Compelling Circumstances For Compassionate Relelase.

#### A. The COVID-19 Crisis.

The novel coronavirus that causes COVID-19 has led to a global pandemic. As of May 15, 2020, worldwide there are over 4.3 million reported COVID-19 cases and 297,241 confirmed deaths. In the United States, the case count stands at 1,412,121 and the death count at 85,990.

The virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects. Infected people can spread the virus to others even if they are asymptomatic, such that simply avoiding people who are coughing or visibly feverish is insufficient.

According to the CDC, people who suffer from certain underlying medical conditions face elevated risk. Such conditions include chronic lung disease, moderate to severe asthma, serious heart conditions, hypertension, high blood pressure, chronic kidney disease, liver disease, diabetes, compromised immune systems (such as from cancer treatment, HIV, autoimmune disease, or use of immunosuppressing medication for other conditions), and severe obesity. One analysis found mortality rates of 13.2% for patients with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6%

for cancer.

The risk of illness or death from COVID-19 is increased for older populations. In a February 29, 2020 preliminary report, individuals age 50-59 had an overall mortality rate of 1.3%, those age 60-69 had an overall 3.6% mortality rate, and those age 70-79 had an 8% mortality rate.

In many people, COVID-19 causes fever, cough, and shortness of breath. But for people over the age of fifty or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe. Most people in higher-risk categories who develop serious illness will need advanced support. This level of supportive care requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse-topatient ratios, respiratory therapists, and intensive-care physicians.

In patients who do not die, COVID-19 can severely damage lung tissue, requiring an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a medical condition called "myocarditis," or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.

Emerging evidence also suggests that COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days.

Even some younger and healthier people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.

The estimated fatality rate associated with COVID-19 has been estimated to range from 0.1 to 6 percent, meaning COVID-19 may be as much as 35 times more fatal

than seasonal influenza. Although many people who contract COVID-19 will exhibit relatively mild symptoms, the virus will manifest in some 20 percent of cases as a "more severe disease requiring medical intervention and support.

There is no vaccine against COVID-19 and there is no known medication to prevent or treat infection from COVID-19. Social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including frequently and thoroughly washing hands with soap and water and cleaning and disinfecting high-touch surfaces, are the only known effective measures for protecting people from COVID-19.26 This is especially significant because the virus can spread through people who appear asymptomatic.

Chavez presents that extraordinary and compelling circumstances justify his compassionate release because he: (1) is sixty-one years old; (2) is experiencing a serious deterioration in health due to Colon Cancer, Type 2 diabetes, and hypertension; and (3) has served more than twenty years of his sentence. Chavez's argument tracks the Sentencing Commission's pre-FSA policy statement which provides that "extraordinary and compelling" reasons for compassionate release exist based on the inmate's advanced age and deteriorating health. See U.S.S.G. § 1B1.13, cmt. n.1(B).

Chavez's amended brief also raises the ongoing COVID-19 pandemic, urging that he "is particularly vulnerable to contracting the virus due to his limited mobility, and he is particularly vulnerable to severe complications and death due to his age and underlying medical issues." Chavez's "conditions constitute deterioration that is sufficiently serious and extraordinary to grant him the relief he seeks."

Even prior to the current COVID-19 pandemic, courts have concluded that medical conditions similar or identical to those that Chavez suffers from—including Colon Cancer, diabetes, arthritis, and hypertension—in and of themselves may cause "a serious deterioration in physical or mental health because of the aging process" sufficient to constitute "extraordinary and compelling" circumstances pursuant to the Sentencing Commission's pre-FSA policy statements. See, e.g., United States v. Cantu-Rivera, No. 89-cr-204-H, 2019 WL 2578272, at *1 (S.D. Tex. June 24, 2019) (determining that inmate "meets the age-related definition of extraordinary and compelling circumstances in U.S.S.G. § 1B1.13, comment. (n.1(B))" because inmate

"is 61 years old" and "is experiencing serious deterioration in physical health because of the aging process (arthritic conditions in multiple joints, cataracts, diabetes, prostrate conditions)"). Since the onset of the COVID19 pandemic, courts have determined that inmates suffering from conditions such as hypertension and diabetes are now at an even greater risk of deteriorating health, presenting "extraordinary and compelling" circumstances that may justify compassionate release. See United States v. Rodriguez, No. 2:03-cr-00271-AB, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (determining, with respect to inmate suffering from conditions including diabetes and high blood pressure, "nothing could be more extraordinary and compelling than this pandemic."); accord United States v. Zukerman, No. 16-cr-194-AT, 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (determining that inmate suffering from "diabetes, hypertension, and obesity" demonstrated "extraordinary and compelling" circumstances justifying compassionate release, in light of COVID-19 pandemic, because "the CDC . . . has explained that individuals over the age of 65 and people of any age who have serious underlying medical conditions, including heart conditions, diabetes, and obesity, are at higher risk for severe illness from COVID-19."); United States v. Colvin, No. 3:19-cr-179-JBA, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (determining that inmate "has demonstrated extraordinary and compelling reasons justifying her immediate release under Section 3582(c)(1)(A) and U.S.S.G. § 1B1.13" because inmate "has diabetes, a serious medical condition, which substantially increases her risk of severe illness if she contracts COVID-19.") (internal quotation marks and alterations omitted); United States v. Pena, No. 15-cr-551-AJN, 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension[.]").

Here, Chavez provides the Court with medical records detailing his various medical conditions, including: (1) a summary from the BOP verifying Colon Cancer's diabetes, hypertension, and cataracts; (2) a summary of medical visits, indicating that Chavez's Cancer "is severely disabling" and causes Chavez "difficulty moving his body or sleeping". Chavez's medical conditions are indeed serious and, in connection with the COVID-19 pandemic, present "extraordinary and compelling" circumstances, for the purposes of U.S.S.G. § 1B1.139 , which warrant a sentence reduction pursuant to Section 3582(c)(1)(A).

7

In addition, the Court may make an "independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)." Beck, 425 F. Supp. 3d at 573. The Court's "independent assessment" in this case reveals that additional "extraordinary and compelling" circumstances justify a reduction in Chavez's sentence. In January, 2000, pursuant to the then-mandatory sentencing guidelines, the Court sentenced Chavez to life imprisonment. Dkt. 162. In 2005, the Supreme Court subsequently determined in Booker that insofar as the guidelines were mandatory, they were unconstitutional, rendering the guidelines "effectively advisory." Ameline, 409 F.3d at 1077. Courts have specifically recognized the significance of Booker where, pursuant to other provisions of the FSA, inmates have sought reductions of sentences imposed prior to Booker. See Jones, 2020 WL 219311, at *4 ("The retroactive nature of the [FSA] provides long-awaited relief to those sentenced under the unconstitutionally imposed mandatory guideline ranges."); accord United States v. Stanback, 377 F. Supp. 3d 618, 625 (W.D. Va. 2019) ("The court finds that it has authority under 18 U.S.C. § 3582(c)(2) to modify Stanback's sentence, taking into account the advisory nature of the guidelines after Booker and the considerations set forth in 18 U.S.C. § 3553(a).").

Chavez was not eligible for resentencing in light of Booker and is currently serving life in prison, pursuant to a judgment rendered under a sentencing regime that is no longer in effect and has since been declared unconstitutional.

Pursuant to the FSA, "the amended § 3582(c)(1)(A)(i) vests courts with independent discretion to determine whether there are 'extraordinary and compelling reasons' to reduce a sentence." United States v. Decator, No. 95-cr-0202-CCB, 2020 WL 1676219, at *3 (D. Md. Apr. 6, 2020). In exercise of that discretion, the Court may conclude that the severity of Chavez's life sentence, imposed under a sentencing regime that is no longer valid, coupled with his deteriorating health, which may be further exacerbated by his incarceration during the COVID-19 pandemic, present "extraordinary and compelling" circumstances that justify a reduction in Chavez's sentence.

B. Consistency with Section 3553(a) Factors.

Having determined that Chavez has satisfied Section 3582(c)'s exhaustion requirement and that "extraordinary and compelling" reasons for a sentence reduction exist, "the Court must next consider the factors set forth in section 3553(a) to the extent they are applicable[.]" United States v. Redd, No. 1:97-cr-00006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020). These factors include: "the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims." United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (citing 18 U.S.C. § 3553(a)(1)-(7)). The Court must address these factors in turn.

1. **Nature and Circumstances of the Offense and History and Characteristics of the Defendant**

The first of the Section 3553(a) factors considers "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1).

Nature and circumstances of Chavez's underlying offenses, drug distribution network is serious. However, "evidence of post sentencing rehabilitation may plainly be relevant to 'the history and characteristics of the defendant.'" Pepper v. United States, 562 U.S. 476, 491 (2011) (citing 18 U.S.C. § 3553(a)(1)). Indeed, "[s]everal courts have . . . considered a defendant's rehabilitation in granting compassionate release." United States v. Brown, No. 4:05-cr-00227-1, 2020 WL 2091802, at *7 (S.D. Iowa Apr. 29, 2020).

Here, in connection with his motion for compassionate release, Chavez submits documentation of his rehabilitation during incarceration. For example, in the time since the Court sentenced Chavez, Chavez has earned more than 60 educational diplomas and has taken a number of other continuing education courses. In addition, during his incarceration, Chavez has not been the subject of any

9

disciplinary incidents and has held a number of jobs, including as an education instructor. Other courts have considered similar accomplishments by an inmate sufficient to establish the inmate's rehabilitation, favoring a sentence reduction. See Brown, 2020 WL 2091802, at *7 (finding that inmate's "rehabilitation cuts in favor of [compassionate] release" where inmate "has not had a single disciplinary incident."); Decator, 2020 WL 1676219, at * 4 (finding that Section 3553(a)(1) factor favored compassionate release because, inter alia, "[w]hile incarcerated, Decator has participated in extensive education and rehabilitative programming; he has participated in over 1,500 hours of programming and has completed more than 70 courses" and "has a minimal, nonviolent disciplinary record."); Redd, 2020 WL 1248493, at *10 (finding that inmate's evidence of rehabilitation favored sentence reduction because inmate "has demonstrated a commitment to self-improvement, devoting hundreds of hours to vocational programs, assisting others in their rehabilitative efforts, exhibiting solid work habits, [and] caring for mental health inmates[.]"); United States v. Perez, No. 88-cr-10094-JTM, 2020 WL 1180719, at *3 (D. Kan. Mar. 11, 2020) (finding that inmate's rehabilitation favored compassionate release where inmate "gained his GED while in prison and has availed himself of various educational programs.").

In addition, Section 3553(a)(1) also considers an inmate's "character, physical and mental condition, family ties, employment, financial resources, community ties, past conduct, criminal history, and drug and alcohol abuse." Mondaca, 2020 WL 1029024, at *4. Courts have determined that this factor may favor sentence reduction where an inmate "has numerous family ties, including family members who will provide for him." Id. Here, a number of Chavez's relatives, including Chavez's children, nieces, nephews, and even Chavez's former spouses, have submitted letters to the Court detailing Chavez's substantial family ties and indicating that they plan to provide for him should the Court reduce Chavez's sentence. ("Once released, [Chavez] has a large family waiting for him to support him and take care of him."); ("my family as a whole, including my immediate family and myself, will provide a strong support base for [Chavez] should [the Court] give him a chance to return to society.").

Chavez prays hat this Court therefore conclude that the above factors favor a reduction in his life sentence.

10

## 2. Need for the Sentence Imposed.

Section 3553(a)(2) considers whether a given sentence complies with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." Dean v. United States, 137 S. Ct. 1170, 1175 (2017). The government may avers that Chavez's "lifetime term of imprisonment serves the statutory objectives of 18 U.S.C. § 3553(a)(2), including by providing a just punishment that reflects the seriousness of his crimes." The Court must disagree. While Chavez's underlying criminal offenses are undeniably serious, Chavez has already served nearly 21-years in prison, which "has consumed a large part of his life and by any measure represents a very substantial punishment that reflects the seriousness of his offenses and the need for general or specific deterrence" and "is also a period of time that promotes respect for the law and provides just punishment for his offenses."

Moreover, given Chavez's "extensive use of prison programming, the only thing left 'to provide the defendant with needed education or vocational training' is to pursue an actual vocation." Brown, 2020 WL 2091802, at *10 (citing U.S.C. § 3553(a)(2)(D)). Indeed, Chavez avers that he has been offered employment up on release. On balance, pursuant to Section 3553(a)(2), there no longer is a need for the Court's original sentence of life imprisonment.

## 3. Remaining Factors

The remaining pertinent section 3553(a) factors require the Court to consider "the kinds of sentences available," "the kinds of sentence and the sentencing range established," "any pertinent policy statement" issued by the Sentencing Commission, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(3)-(6). In addition, the Court "must consider whether the defendant is 'a danger to the safety of any other person or to the community[.]'" Mondaca, 2020 WL 1029024, at

11

*3. The government urges that the remaining Section 3553(a) factors and Parker's risk of endangering others and the community weigh against a reduction in Parker's life sentence.

With respect to the Section 3553(a)(3), "[i]ncarceration . . . is not the only kind of sentence available." Brown, 2020 WL 2091802, at *10 (internal citation omitted). To the contrary, "[n]oncustodial sentences also curtail prized liberty interests and the Defendant always faces the harsh consequences that wait if he violates the conditions attached to such a sentence." Id. (internal citation omitted). While the Sentencing Guidelines provided for a life sentence, see Section 3553(a)(4), "they are but one factor." Brown, 2020 WL 2091802, at *10. And, "because the [Sentencing] Commission never released guidelines with respect to compassionate release under the First Step Act," Section 3553(a)(5)'s "'pertinent policy statement' factor is neutral." Id. "Finally, 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct' also cuts in favor of release." Id. (citing 18 U.S.C. § 3553(a)(6)). While Chavez received a life sentence, co-conspirator ultimately received a reduced sentence.

Chavez does not pose a danger "to the safety of any other person or to the community" so as to preclude the Court from reducing his life sentence. The government urges that "although agents did not learn of actual violent conduct by [Chavez] during his involvement in the conspiracy, [Chavez] certainly did not had the capacity to, and was prepared to, engage in violent acts if necessary to further his drug trafficking activity. If released from prison and Chavez may be subject to close monitoring, this to disprove that he may not cause economic harm to others, including those who trust him."

If released from imprisonment, [Chavez] can be placed on supervised release for a term of five years." Marks, 2020 WL 1908911, at *15 (finding that any risk of danger associated with sentence reduction "can be further mitigated by supervised release."); United States v. Williams, No. 3:04-cr-95-MCR, 2020 WL 1751545, at *3 (N.D. Fla. Apr. 1, 2020) (noting, with respect to inmate's motion for compassionate release, that while "the Court cannot conclude . . . that he poses no risk at all to public safety . . . the risk of him engaging in further criminal conduct is minimal and can be managed through . . . the terms of his supervised release."); see also

12

Mondaca, 2020 WL 1029024, at *4 (noting that inmate's compassionate release posed minimal danger because inmate "will be supervised by the Probation Department upon his release from custody through a five year term of supervised release"). Indeed, the Court's original sentence imposed a number of terms and conditions on Chavez's potential supervised release, requiring Chavez to, inter alia, submit to close monitoring with respect to Chavez's finances and employment; avoid "commit[ting] another Federal, state or local crime"; and refrain from "possess[ing] a firearm or other dangerous weapon[.]. Were Chavez to violate any of the terms and conditions of his supervised release, then the Court "may issue a warrant and revoke supervision[.]".

In accordance with the foregoing, the Court may conclude that neither the remaining Section 3553(a) factors nor Chavez's potential risk of danger may preclude the Court from reducing Chavez's sentence.

### C. Incarcerated People and Staff Are Particularly Vulnerable.

People in environments with confined spaces such as correctional facilities, where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in cruise ships and nursing homes. The close quarters and limited freedom of movement inherent in correctional facilities makes social distancing and other preventive measures difficult or impossible. Moreover, the ability of incarcerated people to adopt preventative measures is completely subject to the dictates of correctional officials who control the housing, schedules, sanitary supplies, and nearly every other aspect of their lives.

Correctional facilities increase the risk of rapid spread of an infectious disease, like COVID-19, because of the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others.

The CDC has issued guidance urging prison administrators to take action to prevent

overcrowding of correctional and detention facilities during a community outbreak. The CDC guidance emphasizes that social distancing is "a cornerstone of reducing transmission of respiratory disease such as COVID-19." It calls not only for social distancing, but also measures for isolating and quarantining detainees and staff who have (or are suspected of having) COVID- 19 from those who do not have (or presumably do not have) the virus.

Many correctional facilities find implementation of these preventive strategies challenging without a significant reduction in prison populations.

As a general matter, correctional facilities frequently lack sufficient medical supplies for the population, and, in times of crisis, medical staff may cease coming to the facilities. Hot water, soap, and paper towels are often in limited supply. Incarcerated people themselves, rather than professional cleaners, are often responsible for cleaning the facilities and often are not given appropriate supplies. This means there are more people who are susceptible to infection all congregated together in a location where fighting the spread of an infection is nearly impossible.

For these reasons, correctional public health experts have recommended the release from custody of people most vulnerable to COVID-19. Exercising authority to enlarge custody to include home confinement or release detainees protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and it also allows for greater risk mitigation for all people held or working in a prison, jail, or detention center. Release of the most vulnerable people from custody also reduces the burden on the region's health-care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time. "BOP should take immediate steps to dramatically downsize the population at FCI, Mendota, with priority given to those at high risk of harm due to their age and health status and thus are likely to require a disproportionate amount of medical resources.

Had Wardens similarly reduced the population at many prisons as called for by the science, the catastrophe we are faced with today may have been avoided. Because they did not, the outbreak is now out of control. This not only poses an unacceptable risk to the health and safety of the incarcerated, but also burdens local

14

hospitals and thus endangers the broader community. Correctional facilities lack adequate medical resources and equipment to treat serious COVID-19 cases, so an outbreak in a prison could overwhelm local hospitals. And as correctional staff enter and leave the facility, they will carry the virus with them. Like the incarcerated people in the facilities where they work, correctional officers face an increased risk of COVID-19 exposure because they are less able to engage in social distancing and because of the shortage of personal protective equipment, also known as PPE. Indeed, as of May 3, the BOP had reported 498 confirmed past and present infections among its prison staff nationwide.

Given these dangers, on an accelerating basis since mid-March of this year, courts in this Circuit and across the country have ordered the release of prisoners and detainees in response to the COVID-19 crisis.

When the dangers of COVID-19 have reached a level where a prison is no longer able to incarcerate its population in constitutional conditions, courts have granted emergency habeas relief for entire classes of prisoners to be evaluated for enlargement of custody on an accelerated basis.

In accordance with the foregoing, the Court may conclude that neither the remaining Section 3553(a) factors nor Chavez's potential risk of danger preclude the Court from reducing his sentence.

## IV. CONCLUSION

Chavez filed an administrative request with the warden on August 19, 2019, seeking compassionate release on a number of grounds including his deteriorating medical condition (**Ex. A.**), his rehabilitation during incarceration, and his substantial time served in comparison to the sentences the Court imposed on Chavez's co-conspirators. The warden denied Chavez's request, and Chavez's present motion advances these same grounds for compassionate release. Accordingly, Chavez has satisfied Section 3582(c)'s exhaustion requirement. Moreover, the severity of Chavez's life sentence, imposed under a sentencing regime that is longer valid, the

all new COVID-19

dangerous nature and risk of infection and death combined with Chavez's medical conditions, make Chavez even more vulnerable in light of the COVID-19 pandemic, and present "extraordinary and compelling" circumstances that justify a reduction in Chavez's sentence. Finally, a reduction in Chavez's life sentence furthers the four purposes of sentencing identified in Section 3553(a): just punishment, deterrence, protection of the public, and rehabilitation.

Reduction in Chavez's life sentence is appropriate, to the extent that the Court may inclined to reduce his sentence, rather than reduce Chavez's sentence to time served plus five years of supervised release, it would be more appropriate for the Court to reduce Chavez's sentence to 25-years of imprisonment plus ten years of supervised release, with the first year of supervised release to be spent in home confinement. In addition, this Court may subject Chavez to the conditions set forth in the Court's amended judgment and commitment order to be issued forthwith, best comports with the FSA and Section 3582(c). Prior to his release, Chavez shall submit to a 14-day quarantine at FCI Mendota, inclusive of any time already spent in quarantine immediately preceding this order.

After his 14-day quarantine, Chavez shall submit to a further health screening by the BOP. If Chavez is found to be exhibiting symptoms consistent with COVID-19 or is confirmed to have COVID-19, Chavez shall not be released to the public absent further order of the Court. During the period of supervised release, and to the extent possible, Chavez shall comply with applicable national, state, and local public-health orders regarding COVID-19.

Date: August 15, 2020                                    Respectfully Submitted

*Roberto Collado Chavez*

16

## CERTIFICATE OF SERVICE

I, Roberto Gallardo Chavez, hereby certify under penalty of perjury, that on this August 15, 2020, I placed a copy of the foregoing:

**AMENDED MOTION AND MOTION FOR REDUCTION OF SENTENCE (COMPASSIONATE RELEASE) PURSUANT TO 18 U.S.C. 3582(C)(1)(A) UNDER THE EXTRAORDINARY DANGEROUS NATURE OF THE COVID-19 OUTBREAK AMONG FEDERAL PRISON POPULATION** in a Mailbox at the FCI, Mendota, affixed and with sufficient postage. A copy of the same was served to the United States District Attorney's office for the Southern District of Iowa.

*/s/ Roberto Gallardo Chavez*